Stephen M. BUCKINGHAM, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: March 29, 1984.

Decided: Aug. 22, 1984.

T. Henley Graves, Fuqua & Graves, Georgetown, for appellant.

John P.M. Sandy, Deputy Atty. Gen., Georgetown, for appellee.

Before McNEILLY, MOORE, and CHRISTIE, JJ.

CHRISTIE, Justice:

## I

Appellant appeals his convictions of various specific crimes. He also appeals from a holding that he is an habitual criminal under 11 *Del.C.* § 4214(a)[1] and from his sentencing under that statute. We affirm his criminal convictions, but we set aside his sentencing under the habitual criminal act.

On April 8, 1983, at around 9:30 p.m., a man dressed in green pants and a denim jacket, wearing a ski mask, ran across the front of the Millsboro Acme grocery store and rushed into the store manager's enclosure. Inside the booth, the man pointed a gun at the manager and demanded that he open the store's safe. The manager did not comply. The gunman then shot the manager, jumped from the booth, grabbed the assistant store manager and ordered him to open the safe. When the assistant manager said that he could not open it, the masked gunman ran from the store and rounded a corner toward the rear portion of the parking lot.

While these events were taking place inside the Acme, a police officer (who had no knowledge of what had been going on in the store) happened to approach the parking lot in his patrol car. As he turned into the parking lot, he noticed an automobile at the rear of the parking lot with its taillights flashing. The officer thinking that the car was disabled, pulled up behind the car to render assistance. As the officer approached the car, appellant came running toward the car from the area behind the store. When he saw the officer, he threw his arms into the air.

The officer ignored that gesture for the moment, and appellant, together with another man who had been waiting in the car, and the officer attempted to deal with the apparently stalled vehicle. The young woman who was sitting behind the wheel failed in what appeared to the officer to be pretended attempts to start the car. The officer's suspicions were aroused by the relative ease with which the car was finally started and by the hasty appearance of appellant from behind the closed stores. He asked the two men and the woman for identification. The men said they had no driver's licenses. The woman produced a Delaware registration card in her own name for the vehicle and a California driver's license. This revealed an inconsistency as to her address.

As the officer was returning to his patrol car to issue the woman a warning for failure to have obtained a Delaware driver's

---

1. 11 *Del.C.* § 4214(a) provides:

   Any person who has been 3 times convicted of a felony, other than those which are specifically mentioned in subsection (b) of this section, under the laws of this State, and/or any other state, United States or any territory of the United States, and who shall thereafter be convicted of a subsequent felony of this State is declared to be an habitual criminal, and the court in which such fourth or subsequent conviction is had, in imposing sentence, may, in its discretion, impose a life sentence upon the person so convicted.

license and to run a warrant check on the two men, an ambulance which had been called for the Acme manager pulled up beside him. The driver asked the officer whether he had called for the ambulance since someone had been shot at the Acme. The officer then called the dispatcher and was informed that there was a report of a robbery and shooting in the immediate vicinity.

Since an armed robbery had apparently occurred in the area from which the defendant had come, the officer took a shotgun in hand and ordered the three people to get out of the car. They were then "frisked" and their car was searched for weapons. By this time, additional police had joined the officer.

Under the passenger seat, a loaded pistol with one expended round was found. Another officer took appellant back to the Acme to be viewed by the eyewitnesses to the robbery. At that time, one customer said appellant's weight, height, and clothing matched those of the gunman but noted that the gunman had had a jacket, and another customer said he was fairly sure, although not certain, that appellant was the robber.

A denim jacket and ski mask were found on the ground adjacent to the Acme, lying in a direct line between the Acme and the stalled car.

Appellant was later indicted on two counts of attempted robbery in the first degree, conspiracy in the second degree, assault in the first degree, and two counts of possession of a deadly weapon during the commission of a felony.

There was a suppression hearing and a three-day jury trial. At the trial, the evidence outlined above was introduced. There was also evidence that defendant had confessed his guilt to a friend and described his actions in detail. Hairs found in the discarded ski mask also linked defendant to the robbery. Appellant did not testify at trial. He was found guilty of all the charges.

The State filed a motion to have appellant sentenced as an habitual criminal under the provisions of 11 *Del.C.* § 4214(a). Appellant admitted that he had been convicted of at least three previous felonies specified in the State's motion, and the Superior Court found that appellant was an habitual criminal under 11 *Del.C.* § 4214(a) and sentenced him to life imprisonment. He was given consecutive sentences on the other charges.

## II

Appellant's prior record indicates that appellant was convicted in 1973 of burglary in the third degree, conspiracy to commit burglary in the third degree, and possession of a firearm during the commission of a felony. In 1977, appellant was convicted of robbery in the first degree and felony theft. On both occasions the convictions arose from a single set of criminal episodes.

On the basis of this Court's recent opinion in *Hall v. State*, Del.Supr., 473 A.2d 352, we find that appellant was not eligible to be sentenced as an habitual offender under 11 *Del.C.* § 4214(a), and we reverse the sentencing order and remand for resentencing.

■ ■ In construing 11 *Del.C.* § 4214(b) in the *Hall* case, we held that the legislature intended to reserve the habitual offender penalties for those individuals who were not rehabilitated after the specified number of separate encounters with the criminal justice system and a corresponding number of chances to reform. The same basic approach is found to apply under 11 *Del.C.* § 4214(a) where three prior convictions are required by statute. Appellant's two sets of multiple convictions cannot be treated as three separate convictions under Delaware's habitual offender statute. Under the subsection of the statute here invoked, three separate convictions are required, each successive to the other, with some chance for rehabilitation after each sentencing, before the extreme penal-

ty of life imprisonment may be brought to bear.

## III

(A) Appellant argues that during the questioning and searches outside the Acme, the police failed to follow the requirements of 11 *Del.C.* § 1902,[2] and, therefore, all the fruits of the police detention were seized in violation of his rights under the Fourth and Fourteenth Amendments of the United States Constitution. In addition, appellant argues that Delaware's detention statute, 11 *Del.C.* § 1902 is in itself unconstitutional because it allows a prolonged detention on less than probable cause and because its language allows police officers to use their own discretion in determining the adequacy of responses from persons questioned.

■ Appellant relies heavily upon the United States Supreme Court decision in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) for the proposition that Delaware's detention statute, 11 *Del.C.* § 1902, allows for the violation of a detained individual's constitutional rights. In the *Dunaway* case, the United States Supreme Court held, as a general proposition, that detention for custodial interrogation without probable cause violates the Fourth and Fourteenth Amendments of the United States Constitution. It is clear that 11 *Del.C.* § 1902 allows a peace officer to detain an individual on less than probable cause. This apparent infirmity of the statute was brought to this Court's attention in *State v. Deputy*, Del.Supr., 433 A.2d 1040 (1981). However, in that case, this Court did not attempt to apply the stan-

dards set forth in *Dunaway* because it was held that the ruling in *Dunaway* did not apply retroactively.

We now rule that the *Dunaway* decision as it has more recently been modified does not invalidate the search or the seizure of evidence complained of in the case at bar because there are recognized exceptions to the sweeping statements made in *Dunaway*.

In the subsequent decision of *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) the United States Supreme Court reflected upon its holding in *Dunaway*, stating:

> [a]lthough we refused in *Dunaway* to find an exception that would swallow the general rule, our opinion recognized that some seizures significantly less intrusive than an arrest have withstood scrutiny under the reasonableness standard embodied in the Fourth Amendment. In these cases, the intrusion of the citizen's privacy "was so much less severe" than that involved in a traditional arrest that "the opposing interest in crime prevention and detention and in the police officer's safety" could support the seizure as reasonable.

After a discussion of several of the leading cases[3] in the area of search and seizure "intrusion" on less than probable cause, the Court came to the following conclusion:

> These cases recognize that some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that

---

**2.** 11 *Del.C.* § 1902 provides:

(a) A peace officer may stop any person abroad, or in a public place, who he has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand of him his name, address, business abroad and where he is going.

(b) Any person so questioned who fails to identify himself or explain his actions to the satisfaction of the officer may be detained and further questioned and investigated.

(c) The total period of detention provided for by this section shall not exceed 2 hours. The

detention is not an arrest and shall not be recorded as an arrest in any official record. At the end of the detention the person so detained shall be released or be arrested and charged with a crime.

**3.** *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), and *United States v. Brigoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity. In these cases, as in *Dunaway*, the Court was applying the ultimate standard of reasonableness embodied in the Fourth Amendment. They are consistent with the general rule that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause. But they demonstrate that the exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary on-the-street detention accompanied by a frisk for weapons involved in *Terry* and *Adams*.

It is our opinion that under the circumstances in evidence in the case at bar, the detention of the appellant pursuant to 11 *Del.C.* § 1902 was reasonable and did not violate either his Fourth or Fourteenth Amendment rights. We need not reach the issue of whether other applications under 11 *Del.C.* § 1902 may violate the federal constitution. The sole issue to be determined by this Court is whether, in this particular case, the police conduct exceeded the parameters of the exception, for limited investigatory stops recognized in *Summers, Terry* and *Adams*. We hold that it does not.

The actions taken by the police were not "unreasonable". Indeed, we find that the actions taken by the police were not only reasonable under the circumstances, but reflected alert and commendable police work.

■ It is apparent that when Officer Long first encountered the "stalled" car and its occupants, and inquired concerning their situation, no "seizure" occurred. Similarly, when appellant appeared from behind the shopping center, Officer Long's inquiry as to his name and his activities did not invoke Fourth Amendment protection.

It was while Officer Long was processing a violation arising from an obsolete driver's license that he learned first from the ambulance driver and then from the police dispatcher, that an armed robbery and a shooting had just occurred in the shopping center where he was parked. He then detained the three suspects at gunpoint and required them to stand near the rear of their car. This action constituted a detention subject to the constraints of the Fourth Amendment.

■ We hold, however, that this " 'limited intrusion on the personal security' of the person detained was justified 'by such substantial law enforcement interests' that the seizure could be made on articulable suspicion not amounting to probable cause." *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319 at 1325, 75 L.Ed.2d 229 (1983), quoting *Summers, supra.*

The legitimate law enforcement interest in this case was in preventing the flight of possible suspects from the immediate vicinity of the crimes. The "brief stop of a suspicious individual in order to ... maintain the *status quo* momentarily while obtaining more information may be most reasonable in light of the facts known to the officer at the time." *Adams, supra* 407 U.S. at 146, 92 S.Ct. at 1923.

In detaining these three subjects, Officer Long acted on reasonable, articulable facts, which justified the detention. The officer had learned from two reliable sources that an armed robbery had just occurred very nearby, at a time when and in an area where few people were about. In addition, he had observed appellant running from the scene of the robbery making a gesture as if to surrender to the officer, and appellant had acted in a highly suspicious manner in attempting to obtain his jacket from the stalled car. We hold that the initial detention was a lawful, limited intrusion reasonably justified under the circumstances.

Appellant argues in the alternative that Officer Long failed to comply with § 1902(a) because he failed to ask all the requisite questions, e.g. he failed to ask "his name, address, business abroad and

where he is going." Appellant, citing *State v. Bowden*, Del.Supr., 273 A.2d 481 (1971), maintains that there must be strict compliance with the statute's express requirements before the police may be permitted to make a seizure, and if the statute is not strictly adhered to, then any evidence obtained must be suppressed.

We find this argument to be unpersuasive as it applied to the facts of this case. We hold that Officer Long's actions were in substantial compliance with the requirements of § 1902(a). In asking the woman and the two men, including appellant, for identification in the form of driver's licenses, he was in effect asking them for reliable verification of their names and addresses. The officer did not ask their destination, but his conversation with them had not been completed before additional information came to his attention which gave him reasonable grounds to detain them further. It should be noted that the statutory language of § 1902(a) specifies that the officer "may" demand of a person answers to the enumerated inquiries. The mandatory term "shall" is not used.

■■■ We find that the thrust of the statute is that a detention is authorized if a person fails to adequately identify himself or, in a limited way, explain his actions. In some cases, one's declaration as to his intended destination is of secondary importance in view of information already known to the officer. In this case, Officer Long's demand for identification put him in substantial compliance with the statute, and there was no error in the admission of the evidence seized as a result of the detention.

■■■ (B) Defendant also challenges the validity of the subsequent search of the passenger compartment of the car. We find that because the detention of appellant and his two companions was proper under the circumstances, the ensuing search of the passenger compartment was also justified. After the detention, the police were involved in a "police investigation at close range when the officer remains particularly vulnerable because a full custodial arrest had not been effected and the officer must make a quick decision as to how to protect himself and others from possible danger." *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). In searching the passenger compartment, the police were acting upon a reasonable belief based on "specific and articulable facts which taken together with the rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons," the balancing of the interests involved, "clearly weighs in favor allowing the police to conduct an area search of the passenger compartment to uncover weapons." *Michigan, supra*, quoting *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880.

The information known to the officers was that an armed robbery resulting in a shooting had just occurred in the immediate vicinity. The three persons who had been detained were suspects and when detained, appellant had retrieved a coat from the passenger compartment in a strangely furtive manner. These articulable facts reasonably warranted the police officer's belief that the three suspects could have been armed and dangerous. This reasonable suspicion justified the search of the passenger compartment for weapons. We agree with the holding that the weapon which was subsequently found was discovered in the course of a lawful search.

■■■ In addition, the evidence indicates that the owner of the car gave her consent to the search. Appellant argues that such consent was not voluntary simply because the owner was in custody. This Court has previously ruled that a person in police custody can voluntarily consent even though coercion is inherent in such custody. *Schaffer v. State*, Del.Supr., 155 Del. 115, 184 A.2d 689 (1962), *cert. denied*, 374 U.S. 834, 83 S.Ct. 1882, 10 L.Ed.2d 1056 (1963). The circumstances under which the consent was given does not indicate any undue coercive atmosphere, and we find

that the evidence would justify the holding by Superior Court that the owner's consent was voluntarily given.

■ (C) The final issue with respect to appellant's detention is raised by the contention that the police impermissibly prolonged the detention by requiring that appellant return to the Acme for a "show up". We hold that the detention with respect to the show up was reasonable and lawful under the circumstances. The police were diligently investigating a very recent crime, witnesses of the crime were still present and suspects had had little or no chance to change their appearance. In cases where it is known that a crime has been committed, a suspect may be detained in order to be viewed by eyewitnesses, unless such travel would unduly prolong the detention. *Summers, supra,* 452 U.S. at 700 n. 12, 101 S.Ct. at 2593 n. 12.

## IV

Appellant argues that the mention by a State witness that appellant had requested a lawyer after he had received his *Miranda* warnings either infringed upon his Fifth Amendment protection against self-incrimination by burdening his exercise of the privilege or violated fundamental concepts of fairness secured by the due process clause by breaching the implicit assertion in the *Miranda* warnings that the invocation of those rights would not be used against him in a subsequent trial.

■ It must be remembered that not every reference to the exercise of the Fifth Amendment privilege warrants a reversal of a conviction. *Styler v. State,* Del.Supr., 417 A.2d 948 (1980); *Shantz v. State,* Del.Supr., 344 A.2d 245 (1975). In this case, there was a single reference to the fact that appellant had invoked his right to a lawyer under *Miranda.* The matter was not pursued by the prosecutor by further questioning nor was it referred to in the State's argument.

We find that the single statement by one of the State's witnesses constituted, at most, harmless error and does not warrant a reversal of appellant's conviction.

## V

Appellant's final argument is that his convictions should be set aside because the police lost a list of witnesses which they had made during the course of their investigation. We find no merit to this contention.

The missing list contained the names of three "on scene" witnesses who were at the Acme at the time of the attempted robbery but were unable to make a positive identification of appellant. Appellant knew that the list was missing before the trial started, but he did not seek any special remedy on account of the loss. Rather, he chose to elicit the testimony of the officer who had made the list, that the list had been made, and that it had disappeared. He also elicited on several occasions testimony from various police officers that the three women who appellant had seen at the store on the day of the crime during the identification process were unable to identify appellant as the gunman.

It has never been contended that the police deliberately destroyed or lost the list.

Appellant's argument is that the loss of the list precluded him from obtaining the testimony of persons on the list, and that the loss denied him the ability to use compulsory process to obtain witnesses in his favor.

■ It is now established that in situations such as this, the compulsory process clause and the due process "[s]anctions may be imposed [against the government or State] only if the criminal defendant makes a plausible showing that the testimony of the [missing] witnesses would have been *material and favorable to his defense,* in ways not merely cumulative to the testimony of available witnesses." *United States v. Valenzuela–Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). (Emphasis added.)

In the case at bar, appellant has not suggested how the testimony of the persons named on the missing list would have been favorable to his defense, in ways not merely cumulative in view of the testimony of available witnesses.

Appellant also argues that the list was especially important because the "show-up" was conducted under suggestive and improper circumstances. Appellant fails, however, to show how this additional testimony would have aided him. He also fails to explain why the recitation of these circumstances would not have been cumulative in relation to testimony he obtained from the police witnesses.

We find no evidence that appellant was denied a fair trial on account of the loss of the list of witnesses.

\*     \*     \*

The convictions are AFFIRMED, but that part of the sentencing which consisted of life imprisonment as an habitual criminal under 11 *Del.C.* § 4214(a) is set aside, and the case is REMANDED for resentencing as to the charge of attempted robbery which gave rise to the sentence of life imprisonment.